### Octavio CASTANEDA d/b/a O. Castaneda's Bail Bonds Company, Appellant,

v.

### The STATE of Texas.

### Nos. 2012–01 - 2016–01.

Court of Criminal Appeals of Texas, En banc.

July 2, 2003.

Opinion on Rehearing June 30, 2004.

---

**306**

Barry P. Hitchings, San Antonio, for Appellant.

Theodore C. Hake, Asst. DA, Edinburg, Matthew Paul, State's Atty., Austin, for State.

## OPINION

JOHNSON, J., delivered the opinion of the court, joined by KELLER, P.J., MEYERS, WOMACK, KEASLER and HERVEY, J.J.

Appellant is a bail bondsman. He issued bail bonds for the principals in these five cases. Thereafter, the principals were detained by the United States Immigration and Naturalization Service (INS) and ultimately, some were deported. None of the principals appeared in court, in violation of the terms of the bonds. The trial court forfeited each of the bonds, and upon the state's motion, appellant was ordered to pay the full amounts of the bonds. Appellant appealed those rulings. The court of appeals affirmed the trial court. *Castaneda v. State*, 55 S.W.3d 729 (Tex.App.-Corpus Christi 2001). The court of appeals held that "where the bail bondsman assumes the risk that the principal will be deported, as here, he is liable on the bond." *Id.* at 730. Appellant sought discretionary review before this Court. We affirm in part and reverse in part.

The five principals are all Mexican nationals who were apparently in the United States illegally. Appellant posted bond for each of them. The face of four of the five bonds contained information, each with slightly differing wording, stating that it was noted that the principal is in violation of Code of Federal Regulations Title 8, § 315(3) & (4), and pursuant to a new law, would be taken into custody by the INS and transported to Los Fresnos, Texas. The fifth bond did not contain this explicit note on its face, but it is not disputed that appellant knew, when he issued the bonds, that all five principals were subject to detention by the INS.

In most instances, bondsmen are hired to obtain the release from custody of the principal. Such release may allow the principal to continue to work or attend school. Not infrequently, however, the posting of bond will have another use.

A principal who has charges pending in more than one jurisdiction may use bond as a way to exercise what little control

may be available to a defendant in determining the order of disposition of the pending charges. If the principal wishes to first dispose of charges in jurisdiction A but is in the custody of jurisdiction B, posting bond in jurisdiction B will cause the principal's transfer to jurisdiction A. If, after transfer of the principal to jurisdiction A, the surety surrenders the bond in jurisdiction B, jurisdiction B will file a detainer for the principal in jurisdiction A. Thereafter, when the charges in jurisdiction A are resolved, the principal will be returned to jurisdiction B. If this is the intended chain of events, the surety has accomplished exactly what he was hired to do, even though the principal remained in custody during the entire sequence.

In the cases before us, appellant posted bond for five principals, all of whom had detainers from the INS. After bond was posted on each of the state charges, each principal was transferred into INS custody and thereafter failed to appear in state court on the appointed date. The trial court forfeited each bond, and the state filed a demand for judgment on each forfeiture. The trial court granted judgment *nisi* in each case, and appellant appealed.

The court of appeals affirmed the judgments, saying;

> This group of cases involves, essentially, one issue. That is, "Is a bail bondsman liable on the bond when the principal is deported prior to the time the principal is set to appear in court?" We hold that where the bail bondsman assumes the risk that the principal will be deported, as here, he is liable on the bond.

*Castaneda*, 55 S.W.3d at 730. The issue decided by the court of appeals is, however, subject to a threshold inquiry: was the surety liable for the bond at all at the time the principal was set to appear in court? In one of these cases, the answer is "yes," but in four of these cases, the answer is that either the surety already had been legally exonerated on the bond under Tex. Code Crim. Proc., art. 17.16 before the principal failed to appear, or the trial court had allowed appellant to surrender the bond before final judgment.

### I.

We note that we have authority to consider and address threshold issues, that is, issues which were not directly raised by the parties but which must be considered and decided in the course of reviewing the grounds presented. In *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990), we explained that "[o]nce an appellate court has jurisdiction over a case, the limits of the issues that the court may address are set only by that court's discretion and any valid restrictive statute." Such discretionary consideration of threshold issues is especially appropriate when the issue implicates the authority of the trial court to act.[1] We therefore may, in our discretion, consider the threshold issue of whether appellant was liable on the bonds at the time the principals were set to appear in court.

Surrender of surety bond is covered by Article 17.16 of the Code of Criminal Procedure[2], which states;

---

1. We recently decided another case on a threshold issue. In *Ex parte Fierro*, 79 S.W.3d 54 (Tex.Crim.App.2002), a seated and sworn juror was excused because the trial court had erroneously determined that the juror was related to the defendant within the third degree of consanguinity. Even though a claim asserting the erroneous determination of consanguinity had not been raised on ap-

peal, examination of the issue was necessary to our holding that the trial court did not have authority to declare a mistrial in such circumstances.

2. Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

**Discharge of liability; surrender or incarceration of principal before forfeiture**

(a) A surety may before forfeiture relieve himself of his undertaking by:

(1) surrendering the accused into the custody of the sheriff of the county where the prosecution is pending; or

(2) delivering to the sheriff of the county where the prosecution is pending an affidavit stating that the accused is incarcerated in federal custody, in the custody of any state, or in any county of this state.

(b) For the purposes of Subsection (a)(2) of this article, the bond is discharged and the surety is absolved of liability on the bond on the sheriff's verification of the incarceration of the accused.

By its plain language, art. 17.16 releases a surety from liability on a bond when verification of the principal's incarceration in another jurisdiction is requested and the sheriff is able to verify that incarceration. When incarceration in the receiving jurisdiction is verified, the surety is *automatically* released from liability; neither further action by the surety nor approval by a court is required. There is no requirement that the surety notify the trial court, or anyone else, that the bond has been surrendered or to request that a detainer or arrest warrant be entered so that the principal is subject to return to the sending jurisdiction.

In these cases, the other jurisdiction was federal. It appears from the record that appellant was hired to post bond so that the principals would be transferred to federal custody. After the bonds were posted and his principals transferred into INS custody, appellant filed, for three of the principals, the forms requesting verification by the Hidalgo County sheriff. In these three cases, the sheriff verified that the principal was in INS custody and provided a verification form. In these three cases, appellant then filed an Affidavit of Bondsman for Surrender of Principal, with the verification form attached, and requested the trial judge to issue a warrant for the arrest of the principal. Such requests are not required to release the surety from liability under the plain language of art. 17.16, but appear to have been courtesy notification to the trial court that the principal was no longer in the custody of Hidalgo County. However, in each case, the trial court refused to issue the warrant.

In due course, each case was called for trial, and in each case, the principal failed to appear. Even though, by operation of law, appellant had been released from liability on the three bonds, the state requested, and the trial court granted, a judgment *nisi* against appellant and each principal. Because appellant's liability on those three bonds had been exonerated "on the sheriff's verification of the incarceration of the accused," the trial court was without authority to find appellant liable for those bonds. Accordingly, we reverse and remand to the trial court for entry of a judgment in favor of appellant in those three cases, specifically, Oscar Oviedo Gutierrez (petition number 2012–01), Mario Ortiz Hurtado (2013–01), and Carlos Javier Ramos Medrano (2015–01).

## II.

In the case of Julio Quilantan Padron (2014–01), the record shows that no sheriff's verification was filed before his failure to appear on November 17, 1998. The day of the failure to appear, appellant filed an affidavit of surrender with the trial judge. Two days later, the trial court signed an order that appears to accept appellant's surrender of the bond. The docket sheet on that day shows a notation:

"crt aprvd bond surrender (Castaneda Bail Bonds)

> def at INS (Bayview) awaiting deportation
>
> order signed[.]"

This notation is followed by what appears to be the initials of the trial judge.

The docket sheet further reveals that Quilantan Padron was rearrested on June 12, 1999, for driving while intoxicated, and that the original charge was recalled on June 15. At that setting, both court and state files were noted as missing, although a subsequent notation indicated that the court file had been found. The trial court "set PR bond of $2500.00" and reset for June 29. This entry also bears the initials of the trial judge. Thus it appears that the trial court believed that there was no outstanding bond on the principal and ordered a new, personal bond.

On June 29, the file was again missing, and the case was reset until July 9. On July 9, the case was called without response. It was called again on July 13, again with no response, and the trial court granted judgment *nisi*. It is unclear how the principal was released from custody, but appellant had been released from liability on the original bond, and the record does not show a surety as to the bond set on June 15. From the entries on the docket sheet, we conclude that appellant had been released from the bond that he posted on August 22, 1998, and the judgment *nisi* was granted as to the personal bond set on June 15, 1999. Accordingly, we reverse and remand to the trial court for entry of a judgment in favor of appellant in that case, specifically, Julio Quilantan Padron (2014–01).

### III.

■ In the case of Jose García, (2016–01), the record shows that the sheriff's verification occurred on December 29, 1998. However, García failed to appear on January 20, 1998. The record contains an order identical in form to the order releasing appellant from liability for Quilantan Padron, but this order is unsigned. Thus, with respect to the bond for García, appellant failed to relieve himself of liability on the bond before forfeiture, and we therefore address the merits of the three grounds for review presented in appellant's petition.

■ The first ground for review asks "[w]hether a bail bond surety is liable on a bail bond forfeiture when its principal is deported prior to the time that the principal was required to appear in a Texas court." As discussed above, art. 17.16 sets out the specific conditions under which a surety may be absolved of liability on a bond before forfeiture, i.e., on the sheriff's verification of the principal's incarceration in the custody of another jurisdiction. It contains no provision for absolving liability where a principal is deported from the United States but is not shown to be in the custody of the foreign jurisdiction, and appellant has failed to cite any statutory or constitutional authority which contains such a provision. Further, appellant has not shown that the principal was, in fact, deported before his failure to appear or that he was in custody in any jurisdiction. Lacking such a showing, any decision on the ground presented would be an advisory opinion. We overrule ground for review one.

■ The second ground for review asks "[whether] a bail bond surety is liable after executing a bail bond where the sheriff never releases the principal on the bail bond but rather transfers the principal to the custody of the [INS]."

Article 17.29(a) requires that when "the accused has given the required bond, . . . , he shall be at once set at liberty." It

contains no requirement that the principal actually be released from all custody, and appellant fails to cite any statutory or constitutional authority which contains such a provision.

In these cases, the sheriff did as the law requires and, upon receipt of the bond, released the principal from the custody of Hidalgo County and set him at liberty as to Hidalgo County. That is all the sheriff can legally do; he has no authority to accept a surety bond on a detainer filed by another jurisdiction. To require actual release of the principal to the street before a surety is liable on a bond could require the sheriff to either ignore outstanding warrants from other jurisdictions and release the principal to the street or risk holding a bond made worthless by failure to so release.

In support of exoneration, appellant invokes TEX.CODE CRIM. PROC., art. 22.13(3); "The sickness of the principal or *some uncontrollable circumstance which prevented his appearance at court,* and it must, in every such case, be shown that his failure to appear arose from no fault on his part. The causes mentioned in this subdivision shall not be deemed sufficient to exonerate the principal and his sureties, if any, unless such principal appear before final judgment on the bond to answer the accusation against him, or show sufficient cause for not so appearing." (Emphasis added.) Appellant asserts that the principals were in federal custody and that such custody suffices as "some uncontrollable circumstance."

Appellant cites a number of cases, both state and federal, that involve principals who failed to appear in court after sureties had made bond and the principals had been thereafter extradited to or placed in custody in other jurisdictions. However, even if we equate deportation to extradition, appellant has failed to prove that the principal was in fact actually deported to Mexico or the circumstances of such deportation. ·

We do not, however, need to resolve the question of "uncontrollable circumstances." Art. 22.13(3) concludes with the words "[t]he causes mentioned in this subdivision shall not be deemed sufficient to exonerate the principal and his sureties, if any, unless such principal appear before final judgment on the bond to answer the accusation against him, or show sufficient cause for not so appearing."

Appellant posted bond on November 14, 1997. The case was called on January 20, 1998, but the principal did not appear. The trial court forfeited the bond, ordered that a *capias* issue and granted judgment *nisi.* On December 18, 1998, the case was recalled, but again the principal did not appear. The docket sheet indicates that the judgment *nisi* was still pending. The capias issued on January 14, 1999. Seven resets followed, with notations on two of them that the surrender of the bond was at issue. On August 10, 1999, the trial court granted the relief prayed for by the state, and, on August 11, 1999, signed a final judgment of bond forfeiture. At no time before final judgment did the principal appear, nor did anyone "show sufficient cause for not so appearing." Therefore, by the plain language of the statute, "uncontrollable circumstances" cannot be deemed sufficient to exonerate the principal and his sureties. Accordingly, we overrule ground for review two.

## IV.

■ Question three asks "whether a bail bond forfeiture final judgment in which there is no remittitur can bear any interest." Appellant argues that pre- and post-judgment interest may be charged on a bond forfeiture only when the trial court

also orders a remittitur, a reduction in payment of the full bond amount.

■ The record reflects that appellant raised this issue for the first time in the court of appeals. It is well settled that, before a party may complain on appeal concerning the award of pre- or post-judgment interest, he must in some way inform the trial court of his dissatisfaction with the judgment or the error is waived. *See e.g., Allright, Inc. v. Pearson,* 735 S.W.2d 240, 240–41 (Tex.1987); *Miller v. Kendall,* 804 S.W.2d 933, 945 (Tex.App.-Houston [1st Dist.] 1990, no writ); *Western Construction Company v. Valero Transmission Company,* 655 S.W.2d 251, 255–56 (Tex.App.-Corpus Christi 1983, no writ); *McLemore v. Johnston,* 585 S.W.2d 347, 349 (Tex.Civ.App.-Dallas 1979, no writ). Because appellant did not raise this issue in the trial court, he has failed to preserve error. Point three is overruled.

We affirm the court of appeals' judgment with respect to Jose García (2016–01).

COCHRAN, J., filed a dissenting opinion, joined by PRICE and HOLCOMB, J.J.

COCHRAN, J., dissenting, joined by PRICE and HOLCOMB, JJ.

I respectfully dissent. The Court reverses four out of five bond forfeiture final judgments for the State and imposes final judgments for the bondsman on an issue and a statute that neither party relied upon in the trial court nor in the court of appeals. First, the Court bases its decision upon an interpretation of a statute that neither this, nor any other appellate court, has ever made. Second, I believe that the Court misreads article 17.16(a)(2) & (b), the bail bond statute upon which it relies, as well as that statute's purpose. Third, I think the Court misconstrues the underlying purpose of bail bonds. Fourth, the Court fails to grant any deference to the trial court's or court of appeals' factual findings, legal reasoning, or result.

I.

The five principals[1] were all Mexican nationals who were apparently in the United States illegally. Appellant, the owner of a bail bond company, posted bonds for each of the principals. Four out of the five bonds contained a typed note:

> Note: Principal is in violation of code of federal regulations title "8" C.F.R. section 315(3) & (4). Will be taken into custody by I.N.S. Los Fresnos Texas.

The fifth bond did not contain this note, but it was not disputed that the bonding company knew, when it issued the bonds, that all five principals were subject to preexisting I.N.S. detainers and thus were highly likely to be deported once Texas criminal charges were resolved.

Nonetheless, the bondsman posted the bonds, thereby promising to ensure each principal's appearance in court on the appointed day or to forfeit the face amount of the bonds. None of the principals appeared in the Hidalgo County court on the appointed day, or at any time thereafter. Therefore, the State moved for bond forfeiture and the trial court signed a judgment nisi. The trial court later held a

---

1. Oscar Oviedo Gutierrez, Mario Ortiz Hurtado, Carlos Javier Ramos, Jose Garcia, and Julio Cesar Padron (collectively, "the principals") were arrested and charged at various times during 1997 and 1998 for felony drug offenses in Hidalgo County. Three of them were charged with possession of between five and fifty pounds of marijuana; two of them were indicted for possessing between fifty and two hundred pounds of marijuana. These are not "consumer consumption" amounts of marijuana, but rather they are consistent with amounts distributed by organized drug trade cartels.

consolidated bond forfeiture trial on the five judgments nisi.

At that trial, the evidence indicated that, once appellant posted their bonds, the five men were immediately transferred to an I.N.S. facility in Los Fresnos. Nothing is known of what ultimately happened with the principals. Until today, the bondsman had the burden of showing where his principal was, that he could be returned to the prosecuting jurisdiction (unless dead), and that the principal's failure to appear timely in court was an uncontrollable circumstance. Appellant failed to offer admissible evidence at trial: 1) that the principals actually *were* deported; or 2) concerning the principals' present whereabouts.[2] After hearing the evidence, the trial judge explained:

> Right now the way things are looking, Mr. Castaneda, what I'm seeing is an agreement on your part to follow through. I also see clearly that immigration services have taken these people. I also see clearly that you know pretty much that when you're making this bond and you're making this agreement that they're going to be taken. There's hardly any question that the

immigration department is going to be taking them away. . . .

> The bottom line though is that, you know, what's going to be the ultimate determination when a bonding company knowingly accepts an obligation that they run the risk that the immigration service, the supreme commander, so to speak, in this area dealing with immigration, that they are the ones that are going to have the final shot and the final call . . . the way I see it right now to the extent that bail bond companies are able to make bonds there knowing that they are going to be taken away, they get all the money and none of the risk, if the Court rules in your favor.

Based upon the evidence in the record, the trial court entered a final judgment for the State on each bond. The bonding company appealed, and the court of appeals affirmed the trial court's judgment.

We granted review to determine whether the court of appeals correctly concluded that a bail bondsman, who knows when he issues the bond that the principal is subject to an Immigration and Naturalization Service ("I.N.S.") detainer and is therefore likely to be deported, is liable on the bond when the principal does not appear in court.[3] I agree with both the trial judge

---

2. The trial judge summarized the facts:

> Am I hearing you from this statement, [prosecutor], that this Jose Garcia never really saw freedom from the point that he was . . . incarcerated in the Hidalgo County jail and that he went sort of from county custody to federal custody?

The prosecutor responded:

> Well, certainly the papers indicate that, Your Honor, but what they also do not show, though, is that after he was taken or supposedly—allegedly taken by INS, he is subject to deportation which the bond company fully well knew at the time they started the bail bond—excuse me, they signed the bail bond with him.

When the trial court asked if it was clear that the principals had actually been deported, the prosecutor stated that the record was unclear.

"Whether they, in fact, are in I.N.S. custody, removed in fact, and have come back has never been resolved nor is there any indication that the bond company has made any effort to find out where they are." Until today, that was the bail bondsman's burden.

3. We granted the following grounds for review:

1. The court of appeals and the trial court erred in ruling that a bail bond surety is liable on a bail bond forfeiture when federal immigration authorities either retain custody or deport the bail bond surety's principal prior to the time that the principal was required to appear in a Texas court.
2. The court of appeals and the trial court erred in ruling that a bail bond surety is liable after executing a bail bond in which

and the court of appeals that, when "the bail bondsman assumes the risk that the principal will be deported, as here, he is liable on the bond." *Castaneda v. State,* 55 S.W.3d 729, 730 (Tex.App.-Corpus Christi 2001). This is basic contract law.

## II.

The Court does not address the basis for the trial court and court of appeals' decisions. Instead, it reverses and renders summary judgment (for which he did not ask) for the bail bondsman on a basis that neither of these courts nor the parties have had an opportunity to address.

### A. Unassigned error.

The Court states that its consideration of unassigned error is appropriate in this case because this "threshold" issue involves "the authority of the trial court to act."[4] This unassigned error involves a statutory provision that this Court has never interpreted before, and thus, we have never before suggested that it might affect a trial court's authority to act.[5] I do not believe that article 17.16 impinges upon the trial court's authority to act.

The Court holds that "the plain language" of article 17.16 states that a "the surety is *automatically* released from lia-

bility" once he delivers an affidavit to the sheriff of the county in which the case is pending that: 1) the principal is incarcerated some place else; and 2) the sheriff verifies that information.[6] Nobody need tell the judge that the bondsman, *sua sponte,* has removed his bond; the judge will find out when the defendant fails to appear in court.[7] The bondsman's contract and responsibility just disappear once he files this verified affidavit. Where the principal actually is and whether he will ever be returned for trial in this jurisdiction are irrelevant; he was, on some specific date, incarcerated in another jurisdiction and that is good enough for bondsman's work.

The language of this statute might appear to be clear and simple on its face. I believe, however, that it was never written for or intended to apply to this situation— one in which the bondsman knows, at the time he issues a bond, that the defendant has a pre-existing I.N.S. detainer and will likely be deported if bail is made. The language in the statute is, at best, ambiguous as it applies to this situation.

The Court's interpretation is made in all good faith and with much facial logic, but its unintended consequences are profound. Here is how it plays out in the drug trade:

---

the sheriff never releases the principal on the bail bond but rather transfers the principal to the federal immigration and naturalization service.

3. The court of appeals and the trial court erred in ruling that a bail bond forfeiture final judgment in which there is no remittitur can bear interest.

4. *Ante,* op. at 312–13.

5. The Court cites *Ex parte Fierro,* 79 S.W.3d 54 (Tex.Crim.App.2002), as support for its present position that it will examine "threshold" unassigned error in this case. *Fierro* is a bit different. In that case, the law had been well established for many years that venire-

persons who are not related to the defendant within the third degree of consanguinity are not excludable, on that basis, from serving as jurors. We did not make new law, consider an issue of first impression which the parties never raised, or interpret, for the first time, a statute which not even the parties had relied upon in the lower courts. *Fierro* involved a simple, noncontroversial, but fatal fact: the trial judge, defense, and prosecution mistakenly believed that, because the venireperson was the defendant's cousin, she was related to him within the third degree of consanguinity.

6. *Ante,* op. at 312–13.

7. *Ante,* op. at 312–13.

Mr. Big hires Julio, Juan, and Jose in Juarez as drug "mules" to drive his marijuana-laden trucks across the border to El Paso. El Paso police officers arrest them and charge them with felony drug possession. Because they are illegal aliens, I.N.S. puts a detainer on them. Mr. Big hires Billy Bondsman to issue a bond in the El Paso cases. The men are immediately transferred to I.N.S. custody. Billy Bondsman dutifully files an affidavit of surrender with the sheriff's verification the very next day. His bond obligation disappears in a puff of smoke. Julio, Juan, and Jose are deported shortly thereafter, only to return to work the next week with different names driving different trucks for Mr. Big.[8] Of course, Julio, Juan, and Jose do not appear in the El Paso court for arraignment. The judge, prosecutor, and citizens had no idea that they had flown the coop until it was much too late. Julio, Juan, and Jose may or may not ever be re-arrested, but Mr. Big is happy that his employees are free and back at work. Billy Bondsman is happy because he made money issuing a risk-free bond. Julio, Juan, and Jose are happy, because they got out of jail and (at least temporarily) out of prosecution, and are back at work, footloose and fancy-free until the next arrest, bond, and deportation.[9]

The Court states that this is the "plain language" meaning of article 17.16, and that therefore, the trial court never had authority to forfeit four of the five principals' bonds because those bonds simply did not exist at the time the trial judge acted. *Ergo,* he had no authority to act.

The trial judge, the court of appeals, and the State have never had an opportunity to address this interpretation of article 17.16. Perhaps each one of them has very good counter-arguments concerning this theory, the legislative history of article 17.16, the purpose of the bail bond system, and the effect that this particular interpretation has upon the Texas criminal justice system. But we will never know because they have never had the opportunity to voice their arguments. Therefore, I must respectfully disagree both with the Court's interpretation and with the fact that the Court decides this matter as unassigned error on an issue of first impression.

## B. The purpose of article 17.16.

The Court's reading of the bare written words of article 17.16 is not implausible. Its interpretation, however, leads to absurd results as demonstrated by these cases and by my hypothetical "Mr. Big" drug trade scam. I do not think that this result is truly what the Texas Legislature intended in 1987 when it amended article 17.16. Perhaps the Court is exactly correct and the Legislature did intend precisely this result, but the existing legislative history does not support it.

The legislative history shows that the ostensible purpose of the amendment was to provide for bail bond exoneration when: 1) the principal is released from jail on bond; 2) he "skips bond" and goes to another jurisdiction; 3) he is jailed by authorities in that other jurisdiction, sub-

---

**8.** *See Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 1714, 155 L.Ed.2d 724 (2003)(noting 1993 Senate investigation committee had found that "criminal aliens who were deported swiftly reentered the county illegally in great numbers").

**9.** Indeed, the Court's opinion indicates that one of the principals, Julio Quilantan Padron,

was deported, re-entered the United States again illegally, and was re-arrested in El Paso for driving while intoxicated more than six months after his original failure to appear. *See ante* at 313–14. Apparently, he was released on a personal bond this time and, once

ject to being returned to the original Texas jurisdiction; and 4) his incarceration in the other jurisdiction occurs before the bond is forfeited.

In 1987, Senator Glasgow sponsored SB185 which amended article 17.16. The testimony at the House Criminal Jurisprudence Committee Hearing is helpful. Mr. Schwartz, for the bondsmen, articulated the purpose of the statute:

> [W]hat we are all trying to accomplish here . . . is to get defendants arrested and returned to jail instead of being out on the street. If they skip bond the state is best served by their return to jail. I sometimes hear people say, well the counties are gonna lose money because they won't have this money until these people are either brought back to jail or until this time passes. The problem is not whether the counties have money or not, that's not what the criminal justice system is designed to provide. The criminal justice system is designed to punish criminals. And the only way you can punish criminals is to get the rascals back in jail. And the only way to punish them good after they get back in jail is to try them. And all we've provided for is some of the new basis, extended basis, under which a person may be exonerated if that defendant is put back into jail, or if that defendant dies, or if that defendant is somewhere incarcerated, either in a federal or state institution. These bills encompass all those ideas. What I'm saying is that if the intent of the legislature is still to get people put back in prison and you want them back there I have an idea how they get back in prison. The bondsman has got to have a purpose to be served if he goes out and gets that

guy back. That purpose is provided for here and that is he gets his money, or he gets a substantial part of his or her money back, and that's the incentive for him to go out and arrest the defendant.[10]

In other words, if the principal who has "skipped" on his bond is later rearrested and available to be brought back to the Texas jurisdiction to be tried and punished, the bondsman should not necessarily be held responsible for the face amount of the bond. The amendment's purpose was to provide an additional incentive to bondsmen to track down a bail-jumper and to ensure that he was put back in jail. Mr. Schwartz then responded to a letter written by Johnny Holmes, the District Attorney of Harris County, who complained

> because the unscrupulous bondsmen would be induced to make any and all bonds regardless of risk, relying on the probability that a defendant who failed to appear would eventually be apprehended and returned to custody through the efforts of some law enforcement agency, thereby entitling the bondsman to complete exoneration after paying the cost of re-arrest.

Little did Mr. Holmes realize that this Court would go further by holding that the bondsman would be exonerated when he makes the bond knowing that the defendant will be transferred to the custody of I.N.S. (or to some other jurisdiction) even though the defendant is *not* re-arrested or apprehended, but instead released somewhere else. How extraordinary that the ostensible purpose of the statute—providing relief for bondsmen whose principals have been re-arrested and who can be *returned* to the prosecuting jurisdiction—has been turned on its head. Under the Court's interpretation, the statute provides

---

again, did not appear for trial. *See ante* at 313–14.

**10.** House Criminal Jurisprudence Committee Hearing on SB 185, tape 3, side 2 (April 8, 1987).

instantaneous relief to bondsmen whose principals have been *removed* from the prosecuting jurisdiction.

Mr. Robert Hughes, representing the Texas Professional Bail Agents Association, then testified that:

> This [bill] was designed and we only meant this for a person who had jumped their bond and was subsequently captured, not somebody who was on bond and was picked up for something else and put in jail and just because they were in jail at the time that it would relieve us from the responsibility on the bond.

At a maximum, then, the bill was intended to apply only to those persons who were actually released on bond, who then "jumped" their bond and were subsequently re-arrested in another jurisdiction. The bill was specifically *not* supposed to apply to someone who was released on bond, then picked up for a new crime and put in jail for that different offense. The notion that a pre-existing detainer by the I.N.S. or some other jurisdiction would totally exonerate a bondsman once the principal was transferred to that other jurisdiction was not even an articulated glimmer in the bondsmen's or legislators' eyes.

Nonetheless, prosecutors were opposed to the bill. Don Clemmer, from the Harris County District Attorney's Office, testified that:

> It is the District Attorney's argument on these cases that the purpose of the bail bond is to assure that the defendant appears in court on the initial setting when he is supposed to appear.... If that person flees and it takes literally years to return him to custody, the criminal case loses much of its value and at that point it just makes no sense to create any type of exoneration for a bondsman for returning him after a great length of time which is what we think these bills would do. We are in favor of any system that would reward a diligent surety or a diligent bondsman in returning a person to custody if it is done in a reasonable amount of time and if it is done by that person's efforts.[11]

Little did Mr. Clemmer realize that precisely the opposite would be true. Under article 17.16(a), this Court holds that the bondsman is immediately exonerated for getting his principal *out* of the jurisdiction and *away* from prosecution.

### C. The purpose of bail bonds.

The Court states that one of the purposes of bond is to provide the principal (here, the defendant) with the means "to exercise what little control may be available to a defendant in determining the order of disposition of the pending

---

11. Mr. Clemmer went on to explain:

> Again, our main concern is that under these bills, if a surety sees that he can be completely exonerated by a law enforcement agent re-arresting someone who he let out on bond, his incentive then will be to bail out anyone he wants to because he can, then take the fee from anyone. He has years and years hoping that person will be re-arrested.... We think the incentives should be there at the beginning when he goes in to make the bond. He should have the incentive to properly evaluate the person, make sure he is a good risk person and then if that person does jump, that he's done enough investigation that he can go locate him quickly and get him back into custody.
>
> Instead, under this Court's holding, the bail bondsman has his highest and best incentive to make bond for those who have a pre-existing detainer from some other jurisdiction, wait a day or two until that person is transferred to the other jurisdiction, and then file an affidavit of surrender. The bondsman doesn't pay a penny and the principal is long gone.

charges."[12] I never knew, until today, that this was a statutory purpose of the Texas bail bond system.

I had always believed that now, as in its earliest days,[13] the purpose of bail was to secure the accused's appearance in court.[14] Under Texas law, a bail bond "is a written undertaking entered into by the defendant and his sureties for the appearance of the principal ... before some court or magis-

---

**12.** *Ante*, op. at 311.

First, neither our statutes or cases suggest that using the pretrial bond system as a defendant's means to control the order of disposing of pending cases in different jurisdictions is a legitimate purpose of bail. *See Ex parte Vance*, 608 S.W.2d 681, 683 (Tex.Crim.App. 1980) ("[t]he primary purpose of an appearance bond is to secure the presence of the defendant in court at his trial"); *Ex Parte Ivey*, 594 S.W.2d 98, 99 (Tex.Crim.App.1980); *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim.App.1980); *Ex parte Reis*, 117 Tex.Crim. 123, 127, 33 S.W.2d 435, 437 (1930) ("[t]he purpose of a bail bond is not only to effectuate the release from custody of a person accused of crime, but 'to secure his presence in order that he may be tried upon the charge against him' "); *see also* TEX. CONST., art. 1, § 11, Interpretive Commentary:

> Bail functions as a complement to the Anglo–American presumption of innocence by permitting a person charged with a criminal offense to regain his liberty with some assurance of his presence at the trial, by requiring him to give security, subject to forfeiture, if he fails to appear and answer before the proper court on the accusation brought against him.

Second, even if controlling the order in which charges are disposed of in different jurisdictions were a legitimate purpose of the Texas bail bond system, that is not what happened here. In these cases, the principals may (or may not) have been deported before their first court appearance, but it is undisputed that they never appeared to answer these charges. Here, the bail bond system functioned as a mechanism for the principals to escape felony prosecution in the United States by presumably being deported to Mexico instead.

**13.** The American system of bail comes directly from the English common law. *See* RONALD GOLDFARB, RANSOM: A CRITIQUE OF THE AMERICAN BAIL SYSTEM 93, 94 (1965) and Jonathon Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 HOUS. L.REV. 731, 744, 747–49 (1996)(explaining that although the American bail system was modeled after English common law, it was adapted to meet America's unique needs). In pre-Norman England, sureties "were literally bound body for body." 4 W.S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 525 (1924); *see also* 2 SIR FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 590 (2d ed.1959) (stating that sureties were "bond corpus pro corpore"); *United States v. Austin*, 614 F.Supp. 1208, 1211 n. 8 (D.N.M.1985) (noting that before the thirteenth century, a surety would be required to surrender if the accused did not appear). If the defendant failed to appear for trial, "the surety [was] liable to suffer the punishment that was hanging over the head of the released prisoner." 2 POLLOCK & MAITLAND, at 589. By the thirteenth century, however, the system of bail had evolved to resemble its present state. *See* 4 HOLDSWORTH, at 525–26 (noting that, by the thirteenth century, it was common practice for a surety to promise to pay a sum of money if the prisoner did not appear in court). The surety was generally a responsible community member and an acquaintance of the accused who promised to pay the sheriff a certain sum of money or property if the prisoner did not appear at trial. *Id.; see also Stack v. Boyle*, 342 U.S. 1, 5, 72 S.Ct. 1, 96 L.Ed. 3 (1951). The common law treated custody as a single, continuous event, recognizing no distinction between state imprisonment and a surety's guardianship. *See* 2 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 124 (1st Am. ed. 1847) (noting that a defendant is "still in custody" while free on bail); *see also Albright v. Oliver*, 510 U.S. 266, 277–78, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) (recognizing that at common law, an arrested person's seizure continued from release on bail until appearance at trial).

**14.** *Stack v. Boyle*, 342 U.S. at 4–5, 72 S.Ct. 1 (noting that "[t]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty ... [T]he modern practice of requiring a bail bond ... serves as additional assurance of the presence of an accused").

trate to answer a criminal accusation...."[15] A bail bond is a commercial contract between the surety or bonding company and the State, in which the surety promises that the principal will appear in court on an appointed date in exchange for the State's promise to release the principal from its custody.[16] If the principal does not appear in court "at any time when his personal appearance is required,"[17] the surety's bond shall be forfeited in accordance with the procedures set out in Chapter 22 of the Code of Criminal Procedure.

Although there are a few specified reasons which excuse the principal's failure to appear and release the surety from his obligation to pay the face amount of the bond,[18] I never knew that a pre-existing detainer from another jurisdiction was one of them.

The Court's interpretation and application of article 17.16 to this "pre-existing detainer" scenario does not accord with the historical or current purpose of bail bonds. Because of the novelty of this legal issue and the lack of any legislative history supporting the application of article 17.16 to this situation, I believe that the wiser course would be to defer discussion of a statute that no one relied upon in the lower courts to a day when the parties have briefed it. We rush to judgment on an issue that was not presented to us.

## D. Deference to the trial court.

I would decide this case on the issue that is, in fact, properly before us. Like the trial judge and the court of appeals, I had always thought that inclusion of language within the bond itself that the principals were subject to an I.N.S. detainer "indicates that the risk of deportation was a part of the bargained-for exchange reflected in the bonding contracts."[19] This is precisely what the State argued and the trial court found.[20] This is a factual finding regarding the objective intent of the

---

**15.** TEX.CODE CRIM. PROC. art. 17.02.

**16.** *See Reyes v. State*, 31 S.W.3d 343, 345–46 (Tex.App.-Corpus Christi 2000, no pet.); *Morin v. State*, 770 S.W.2d 599, 599 (Tex.App.-Houston [14th Dist.] 1989), *pet. dism'd per curiam*, 800 S.W.2d 552 (Tex.Crim.App.1990); *Keith v. State*, 760 S.W.2d 746, 747 (Tex.App.-Fort Worth 1988), *aff'd*, 802 S.W.2d 690 (Tex. Crim.App.1990); *see also La Grotta v. United States*, 77 F.2d 673, 678 (8th Cir.1935) ("[a] bail bond is a contract between the government, on the one side, and the principal and surety, on the other").

**17.** TEX.CODE CRIM. PROC. art. 22.01.

**18.** These reasons are set out in both articles 22.13 and 17.16. One of them is that "some uncontrollable circumstance ... prevented his [the principal's] appearance at court." TEX.CODE CRIM. PROC. art. 22.13(3). But before a surety may take advantage of this contractual excuse, he must: 1) show that the principal's "failure to appear arose from no fault on his [the principal's] part"; and 2) produce the principal "before final judgment on the bond to answer the accusation against him [the

principal], or show sufficient cause for not so appearing." *Id.* Alternatively, under article 17.16, a bondsman may, before any forfeiture occurs, discharge his liability by physically surrendering the defendant in court or producing a sworn affidavit, verified by the sheriff, that the principal is incarcerated in some other jurisdiction. In these excused-non-performance situations, the bondsman must show that he could not perform his contractual promise-his guarantee of the appearance of the principal in court—because of uncontrollable circumstances which occurred without the principal's fault.

**19.** *Castaneda*, 55 S.W.3d at 731.

**20.** The State argued that:

It seems to me in each of these cases the defendant surety knew that there may be an issue as to the deportation of the defendants and assumed a higher degree of risk on the face of their bond at the time of the execution stating they already knew they may be subject to deportation.... The State's position is they assumed a higher degree of risk.

parties when they formed the contract. This factual finding is supported by the evidence; indeed, it was never disputed by appellant. It is well established that, "[w]hen construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." [21]

While there is an implied covenant in any bail contract that the government will not "take any proceedings with the principal which will increase the risks of the sureties or affect their remedy against him," [22] here the bondsman was on notice of the pre-existence of the I.N.S. detainer. The State of Texas did not increase the risks after the bondsman entered the contract. The federal government merely followed through on the risk that the bondsman explicitly spelled out in his bond.

In defense, appellant argued that each principal's "failure to appear for his court setting was a result of an uncontrollable circumstance which arose through no fault of either the Principal or Appellant." He relied upon the affirmative defense set out in article 22.13. While the prior existence of the I.N.S. detainer was certainly beyond the bondsman's control, he could not plead ignorance of its existence because he noted that very fact on his own bond and accepted the contractual risk nonetheless. [23] Thus, the trial judge had a legitimate factual basis for concluding that the expressly acknowledged circumstance that could not be controlled by the bondsman—the I.N.S. detainers—did not give rise to the affirmative defense of an uncontrollable circumstance. [24] Applying normal contract law

**21.** *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994); *see also Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex.1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 518 (Tex.1980).

**22.** *Reese v. United States*, 9 Wall. 13, 76 U.S. 13, 21, 19 L.Ed. 541 (1869).

**23.** Appellant argues that "[t]he Hidalgo County Sheriff's actions in not releasing the principal but delivering him to federal authorities immediately after the execution of a surety bail bond effectively changed the terms of the already executed surety bail bond." This argument might have more merit if appellant did not know of the I.N.S. detainer and could not, with the exercise of reasonable diligence, have discovered that fact.

**24.** Some courts have held that when a defendant becomes incarcerated in another jurisdiction, "a surety who seeks to avoid the penalty [of forfeiture] must demonstrate that the defendant's incarceration was not foreseeable to the surety or preventable by it." *State v. Scherer*, 108 Ohio App.3d 586, 591, 671 N.E.2d 545, 548 (1995). In *Scherer*, the court explained:

> Because a surety bond is a contract, it is subject to the rules governing performance of contracts. According to the rule concerning impossibility of performance, a promisor may be excused from an obligation to the promisee when the performance promised is rendered impossible by operation of law, if that impossibility was not foreseeable to the promisor. The rule is founded on the theory that when the object of an agreement is forbidden by law, the promisor is excused from undertaking its accomplishment. Where the performance promised is only temporarily prohibited, the contract remains in force, though dormant, and when the legal impediment is removed the surety must perform on its undertaking.
>
> A criminal defendant who has been incarcerated by one jurisdiction cannot appear in the courts of another while that incarceration continues, absent extradition by the latter jurisdiction. While the defendant remains incarcerated, a surety who is obligated on a bail bond that obtained the defendant's release by the latter's jurisdiction may be excused from paying the penalty the bond requires because the object of the surety's promise, the defendant's appearance, is forbidden by law. However, the surety must demonstrate that the condition which rendered the defendant's appearance impossible was also unforeseeable prior to its occurrence. Whether any event is foreseeable is a question of fact determined from all the relevant facts and circumstances.

principles to these record facts, the trial court's conclusion that appellant guaranteed the appearance of these five principals at trial *despite* the pre-existing I.N.S. detainers is reasonable.[25] The trial court did not abuse its discretion in concluding that appellant failed to carry his burden of proof on his affirmative defense of uncontrollable circumstances.

Appellant did not rely upon article 17.16 in the trial court. He filed his affidavit of surrender pursuant to article 17.19 and argued "uncontrollable circumstances." He did not rely upon article 17.16 in the court of appeals; he never even cited that provision and, understandably, the court of appeals never addressed the possible applicability of article 17.16 in its opinion. The appellant should not prevail in this Court upon a statutory provision which he never brought to the attention of the lower courts.[26]

Accordingly, I respectfully dissent.

## OPINION ON THE STATE'S MOTIONS FOR REHEARING[1]

HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, WOMACK, and COCHRAN, JJ., joined.

These are bail bond forfeiture cases. In each case, the Thirteenth Court of Appeals

*Id.*; see also *People v. Argonaut Ins. Co.*, 134 Cal.Rptr. 614, 615, 64 Cal.App.3d 665, 667 (Cal.App.1976) (record did not show that principal's deportation made it impossible for surety to produce him in court; noting that administrative procedures exist under which surety .could have requested stay in deportation order and that surety could have invoked procedures under which deported principal could be permitted to return for criminal trial).

**25.** *See* RESTATEMENT (SECOND), CONTRACTS, §§ 261–266. In the introductory note to the Chapter entitled "Impracticability of Performance and Frustration of Purpose," the Restatement notes that "[c]ontract law is strict liability ... even if circumstances have made the contract more burdensome or less desirable than [the obligor] had anticipated." *Id.* at 309. "Usually the impracticability or frustration that is relied upon as a justification for non-performance occurred after the contract was made.... The impracticability or frustration may, however, already have existed, unknown to the obligor, at the time of contracting." *Id.* at 310. *See id.* § 261 ("[w]here, after a contract is made impracticable without his fault by the occurrence of an event *the non-occurrence of which was a basic assumption on which the contract was made*, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary"); § 264 ("[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or

order, that regulation or order is an event *the non-occurrence of which was a basic assumption on which the contract was made")*, *see id.* Comment ("[i]f the [governmental] prohibition or prevention already exists at the time of the making of the contract, the rule stated in § 266(1) rather than that stated in § 261 controls"); *see id.* § 266(1) ("[w]here, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact *of which he has no reason to know and the non-occurrence of which is a basic assumption on which the contract is made*, no duty to render that performance arises, unless the language or circumstances indicate the contrary") (all emphasis added).

**26.** *See Tallant v. State*, 742 S.W.2d 292, 294 (Tex.Crim.App.1987) (stating that "[a]n appellant may not expect this Court to consider a ground for review that does not implicate a determination by the court of appeals of a point of error presented to that court in orderly and timely fashion"); *see also Farrell v. State*, 864 S.W.2d 501, 503 (Tex.Crim.App. 1993) ("to ensure that [this Court] reviews only decisions of the courts of appeals, we insist that the parties, in an orderly and timely fashion, provide the courts of appeals with the first opportunity to resolve the various issues associated with the appeal").

**1.** Our opinion on original submission disposed of five bail bond forfeiture cases, Nos. 2012–01, 2013–01, 2014–01, 2015–01, and

affirmed the trial court's final judgment for the State and against appellant. *Castaneda v. State*, 55 S.W.3d 729, 732 (Tex. App.-Corpus Christi 2001). We affirm the judgments of the court of appeals.

### The Relevant Facts

The principals in these cases—Mario Ortiz Hurtado, Carlos Javier Ramos Medrano, and Oscar Oviedo Gutierrez—were all Mexican nationals arrested in Hidalgo County and charged with felony drug possession. Appellant, the owner of a bail bond company, posted a bail bond for each of the principals.[2] Two of the bail bonds each contained a note to the effect that the principal had violated federal immigration regulations and would be taken into custody by the United States Immigration and Naturalization Service (INS). The third bail bond contained no such note, but it is undisputed that employees of the bail bond company knew that all three principals were subject to pre-existing INS detainers.

Once appellant posted the bail bonds, Hidalgo County officials released the principals from custody and handed them over to INS officials, who in turn incarcerated them in an INS facility in Los Fresnos. Subsequently, it appears, federal immigration judges ordered the principals deported, but the record evidence is silent as to when or whether those deportation orders were actually carried out. The record evidence is also silent as to when or even whether the principals were released from the Los Fresnos facility.

None of the principals appeared in the Hidalgo County court on the appointed day or on any day thereafter.[3] Consequently, the State moved, in each case, for bond forfeiture, and the trial court entered, in each case, a judgment *nisi*. The trial court later consolidated the cases for a bond forfeiture trial, and at that trial appellant sought exoneration from liability on the basis of Article 22.13(3) of the Texas Code of Criminal Procedure.[4] Appellant argued that the principals had been deported and that those deportations amounted to "uncontrollable circumstances" within the meaning of Article 22.13(3). The trial court rejected appellant's Article 22.13(3) affirmative defense, however, and entered final judgment for the State in each case. The final judgments awarded the State the full amounts of the bonds plus 6% interest calculated from the date the trial court signed the judgments *nisi*.

On direct appeal, appellant reiterated his claim that he was entitled to exoneration from liability on the basis of Article

2016-01. The State filed motions for rehearing in only three of those cases, Nos.2012-01, 2013-01, and 2015-01.

2. Appellant posted bond for Hurtado on June 21, 1997, for Ramos on December 18, 1997, and for Gutierrez on March 9, 1998.

3. Hurtado was scheduled to appear in court on September 23, 1997; Ramos was scheduled to appear in court on January 28, 1998; and Gutierrez was scheduled to appear in court on April 9, 1998.

4. At the time of the hearing, Article 22.13 provided in relevant part:

The following causes, and no other, will exonerate the defendant and his sureties, if any, from liability upon the forfeiture taken:

\* \* \*

3. The sickness of the principal or some uncontrollable circumstance which prevented his appearance at court, and it must, in every such case, be shown that his failure to appear arose from no fault on his part. The causes mentioned in this subdivision shall not be deemed sufficient to exonerate the principal and his sureties, if any, unless such principal appear before final judgment on the bond to answer the accusation against him, or show sufficient cause for not so appearing.

22.13(3). Appellant also argued, for the first time, that the trial court erred in entering final judgments for the State because the bail bonds in question were "not ... valid and binding undertaking[s] in law." Finally, appellant argued, again for the first time, that the trial court erred in entering final judgments "for the full amount[s] of the forfeited bail bond[s] plus interest ... at the rate of 6%."

The court of appeals rejected all of appellant's arguments and affirmed the judgments of the trial court. *Castaneda v. State*, 55 S.W.3d at 732. We granted appellant's petitions for discretionary review to determine whether the court of appeals erred.[5] See Tex.R.App. Proc. 66.3(b).

## Analysis

On original submission, we held that the court of appeals erred in affirming the judgments of the trial court because, "by operation of law, appellant had been released from liability on the three bonds" before the State moved for bond forfeiture. *Castaneda v. State*, Nos.2012–01, 2013–01 & 2015–01 (Tex.Crim.App.-July 2, 2003), slip op. at 5. We explained further:

> ... By its plain language, art. 17.16 [6] releases a surety from liability on a bond when verification of the principal's incarceration in another jurisdiction is requested and the sheriff is able to verify that incarceration. When incarceration in the receiving jurisdiction is verified, the surety is *automatically* released from liability; neither further action by the surety nor approval by the court is required....

> In these cases, the other jurisdiction was federal. It appears from the record that appellant was hired to post bond so that the principals would be transferred to federal custody. After the bonds were posted and his principals transferred into INS custody, appellant filed ... the forms requesting verification by the Hidalgo County sheriff. In these three cases, the sheriff verified that the principal was in INS custody....

*Id.* at 4–5 (emphasis in original).

■ In its motions for rehearing, the State correctly points out that in none of the three cases did appellant actually meet Article 17.16's plain requirement that the surety "deliver[ ] to the sheriff ... an affidavit stating that the accused is incarcerated in federal custody." Consequently, our analysis on original submission was fatally flawed.

---

5. In all three cases, appellant's grounds for review are exactly the same, to wit:
 (1) Whether a bail bond surety is liable on a bail bond forfeiture when its principal is deported prior to the time that the principal was required to appear in a Texas court.
 (2) Whether a bail bond surety is liable after executing a bail bond in which the Sheriff never releases the principal on the bail bond but rather transfers the principal to the federal Immigration and Naturalization Service.
 (3) Whether a bail bond forfeiture final judgment in which there is no remittitur can bear any interest.

6. Article 17.16 of the Texas Code of Criminal Procedure provides:

(a) A surety may before forfeiture relieve himself of his undertaking by:
(1) surrendering the accused into the custody of the sheriff of the county where the prosecution is pending; or
(2) delivering to the sheriff of the county where the prosecution is pending an affidavit stating that the accused is incarcerated in federal custody, or in the custody of any state, or in any county of this state.
(b) For the purposes of Subsection (a)(2) of this article, the bond is discharged and the surety is absolved of liability on the bond on the sheriff's verification of the incarceration of the accused.

Furthermore, appellant did not assert an Article 17.16 defense at trial. The trial court's judgments will not be reversed on the basis of Article 17.16. See *Hailey v. State*, 87 S.W.3d 118, 122 (Tex.Crim.App. 2002) (a trial court's decision will not be reversed on a theory the trial court did not have an opportunity to rule upon).

■ In ground for review [7] number one in each case, appellant argues two points: first, that, under Article 17.16, he was released from liability on the bond before the State moved for bond forfeiture; and second, that, for various reasons, the surety bond "was ... not a valid and binding undertaking in law." Since these two arguments were not raised in the trial court, we will not consider them. We overrule ground for review number one in each case.

■ In ground for review number two in each case, appellant argues that he "was entitled to ... exoneration [from liability] pursuant to Article 22.13 § 3[sic] ... because the principal[s'] failure to appear for [their] court setting[s] was a result of an uncontrollable circumstance which arose through no fault of either the principal[s] or the appellant." [8] To prevail with the affirmative defense provided by Article 22.13(3), appellant was required to prove, in each case, that (1) some uncontrollable circumstance prevented the principal's appearance at court; (2) the principal's failure to appear arose through no fault of his own; and (3) the principal appeared before final judgment to answer the accusation against him or had sufficient cause for not appearing. *Hill v. State*, 955 S.W.2d 96, 101 (Tex.Crim.App. 1997). As we noted previously, the record evidence is silent with respect to what happened to the principals once they were incarcerated in the INS facility in Los Fresnos. It is not known when or even whether they were actually deported, or when or even whether they were released from the INS facility. On this record, then, the trial court, as the trier of fact, could have reasonably concluded, in each case, that appellant failed to prove by a preponderance of the evidence the first and third prongs of the Article 22.13(3) affirmative defense. In other words, the trial court could have reasonably concluded that appellant failed to prove the principals' immigration status and whereabouts on the days they were scheduled to appear in state court. Even if the principals' incarceration in Los Fresnos or their alleged deportations were considered "uncontrollable circumstances" preventing their appearance in court, on this record the trial court could have reasonably concluded, in each case, that appellant failed to prove that the principals' failure to appear arose through no fault of their own, since they were apparently in this country illegally.

Appellant also makes other arguments under ground for review number two in each case, but he failed to make those arguments in the trial court, so we will not consider them. We overrule ground for review number two in each case.

Finally, in ground for review number three in each case, appellant argues that, "under Texas law, the State is not entitled to recover interest on a bail bond forfeiture judgment in the full amount of the forfeited bail bond." Again, however, appellant failed to make such an argument in the trial court, so we will not consider it. See *Allright, Inc., v. Pearson*, 735 S.W.2d 240 (Tex.1987) (plaintiff, who failed to complain to the trial court regarding its failure to award pre-judgment interest, may not

---

**7.** In his brief in this Court, appellant terms his grounds for review "points of error."

**8.** See footnote three, *supra*.

complain of that fact on appeal). We over-rule ground for review number three in each case.

We affirm the judgments of the court of appeals.

JOHNSON, J., filed a dissenting opinion, in which MEYERS, KEASLER, and HERVEY, JJ., joined.

JOHNSON, J., dissenting.

For the reasons expressed in the Court's opinion on original submission, *Casteñeda v. State*, Nos.2012–01, 2013–01, 2014–01, 2015–01, 2016–01, 2003 Tex.Crim.App. LEXIS 162 (Tex.Crim.App. July 2, 2003), I respectfully dissent.