

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00046-CR

———————————————

ADAN CHAVEZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. DC89-CR2023-0003

Before Sudderth, C.J.; Kerr and Walker, JJ.
Opinion by Chief Justice Sudderth

# OPINION

In this habeas case, Appellant Adan Chavez challenges the trial court's refusal to lower his $1 million bail for his pending murder charge.[1]  The State argues that Chavez's excessive-bail challenge is not cognizable on pretrial habeas because federal authorities have issued a warrant for his arrest, so even if Chavez posts bail for his murder charge, he will be transferred to federal custody rather than immediately released.  And regardless, the State contends, the $1 million bail is justified given the gravity of Chavez's offense, the threat he poses to the community, his criminal history, his prior failures to appear, and his out-of-town ties.

We disagree with the State on both fronts.  First, Chavez's federal warrant does not undermine the cognizability of his excessive-bail challenge because, whether or not another jurisdiction seeks to detain him, habeas relief could result in his immediate release from Wichita County's unlawful confinement or restraint.  And second, although the statutory bail considerations support a reasonably high bail in this case, the record before us does not contain sufficient evidence to demonstrate that a bail of $1 million is necessary to satisfy the government's legitimate interests.  Accordingly, we will reverse.

---

[1]The State contends that Chavez is also charged with deadly conduct, but the case before us involves the bail set on only the murder charge.

## I. Background

The details of Chavez's alleged offense are confined to two probable-cause affidavits that accompanied his arrest warrants.[2] According to those affidavits, Chavez shot a man—Jorge Gonzalez—in front of a Dollar Saver store in the last of a series of confrontations between Chavez and Gonzalez that day.

In the morning, Chavez had been involved in a fight with Gonzalez. One of the two probable-cause affidavits indicated that the fight involved two of Gonzalez's brothers as well, and based on the address listed for the fight, it appears to have taken place down the street from the Gonzalezes' home. When the police talked to the Gonzalez brothers later that morning, they were told that Chavez had warned that he would come back with a gun. One of the brothers also showed the officers text messages that had allegedly come from Chavez threatening harm.[3] And, a few hours

---

[2] The State relied on these affidavits to recite the details of Chavez's alleged offense for purposes of the habeas proceeding below, so we are similarly limited. *See Ex parte Anunobi*, 278 S.W.3d 425, 426 n.1 (Tex. App.—San Antonio 2008, no pet.) ("Our consideration of this appeal is limited to the record before us."); *Ex Parte Johnson*, No. 01-91-00864-CR, 1991 WL 273264, at *1 (Tex. App.—Houston [1st Dist.] Dec. 19, 1991, no writ) (not designated for publication) ("Our review on appeal is limited to the record properly before us, and assertions in the brief that are unsupported by the record will not be accepted as fact.").

[3] The text messages are not in the record so it is unclear what they said, how many there were, or when they were received. One of the two probable-cause affidavits summarized the content of the text messages as "making threats to harm the Gonzalez brothers."

after talking with the police, the Gonzalez brothers returned home to find that their residence had been shot at multiple times.

This led up to the final confrontation of the day at a nearby Dollar Saver store where Chavez and Gonzalez first exchanged words in the parking lot. When Chavez proceeded to get out of the truck he was in, he pulled a rifle out of a cooler in the truck's bed, and Gonzalez told him to put down the gun and fight him. Instead, Chavez pulled the trigger and shot Gonzalez multiple times. Then Chavez climbed back into the truck and fled. Gonzalez died at the scene.

The police subsequently received a tip regarding Chavez's location, and when they executed a search warrant, they found a rifle that a crime lab traced back to the murder.[4] The rifle was also traced to the shooting at the Gonzalezes' home earlier in the day. Based on this evidence, the police obtained warrants to arrest Chavez for murder and for deadly conduct.

Chavez was subsequently indicted for murder, and his bail was set at $1 million. He filed a petition for writ of habeas corpus arguing that his bail was excessive. *See* Tex. Code Crim. Proc. Ann. arts. 11.01, .23.

In the brief habeas hearing that followed, only one witness testified: Chavez's mother. A primary focus of her testimony was Chavez's inability to afford the

---

[4]One of the probable-cause affidavits listed the address where law enforcement found the murder weapon, but it was not Chavez's home address, and the affidavit did not clarify how Chavez was connected to the address.

$1 million bail. She explained that Chavez's girlfriend[5]—who was the mother of his infant daughter and with whom he lived—had spoken to a bondsman, and the bondsman required ten percent of the bail amount. Chavez's mother stated that neither she nor Chavez's girlfriend could afford to pay ten percent of $1 million, i.e., $100,000. The family had "talked about pitching in, everybody, [Chavez's] sisters and [mother] . . . and his baby mother as well," and the most they could afford to pay was $8,000—ten percent of an $80,000 bail.[6] When asked about Chavez's possessions, his mother stated that Chavez did not own a home and did not own a vehicle.

His mother also described his family ties to Wichita County—she, his five sisters, three children, and long-term girlfriend all lived there. She confirmed that if Chavez were released from all government custody, he would live at home with his girlfriend and their daughter. Chavez was 24 years old at the time of the habeas hearing, and he had worked for a company in the roofing industry since he was a

---

[5]Although Chavez's mother testified that the woman he lived with was not his wife, Chavez's unsworn declarations of his indigency indicated that he lived with his "wife."

[6]Chavez filed two separate unsworn declarations of his indigency in very different handwriting and with very different signatures. One of the declarations indicated that he did not have a job and that the income earned by all of the adults in his household was "NA." The other declaration stated that he worked as a roofer, that he earned about $1,000 per week, and that the adults in his household earned a total of $6,000 per month. The State did not offer either document into evidence at the habeas hearing, nor does it mention the documents on appeal. Regardless, the record indicates that Chavez was declared indigent and appointed counsel.

teenager. Although Chavez's mother had not spoken to his boss, she predicted that he would be able to resume work upon his release.

She also assured the court that Chavez would submit to bail conditions and that she and Chavez's girlfriend would report any violations to the court. Although Chavez did not have a car, his mother stated that she, Chavez's girlfriend, and his five sisters could help transport him to any court settings. Many of his sisters were in the courtroom—presumably to support him—during the habeas hearing.

The State cross-examined Chavez's mother, and it used her testimony to successfully offer a series of exhibits: the probable-cause affidavits detailing the alleged murder, photos of the victim and murder weapon, the medical examiner's cause-of-death report, an email printout of Chavez's criminal history, court documents related to Chavez's pending federal-court charge, and jail disciplinary reports, to name a few. Chavez's mother had limited (if any) knowledge of the information contained in these exhibits, so most of the documents went unexplained apart from the State's description of them when it offered them into evidence.

But the State did elicit some testimony from Chavez's mother on topics within her knowledge. Chavez's mother confirmed that he often worked out of town, that he had a conviction for assault family violence, and that he had a pending federal charge for transporting illegal aliens while in the San Antonio area. She also acknowledged that there was a hold on his detention—what the federal records listed as a "no bail warrant"—related to Chavez's federal charge. [Capitalization altered.]

She explained that Chavez wanted to post bail on his murder charge so he could go to San Antonio and take care of the federal case.

At the end of the hearing, the State emphasized that "the gravity of this crime [wa]s extremely concerning to the safety of th[e] community," and it argued that Chavez's "travel with work . . . [and] smuggling of illegal aliens" created a "concern [as] to what connections he might have to the border or to moving around within the State of Texas itself." The trial court agreed, concluding that the $1 million bail was not excessive "in light of the flight risk situation if he were released and the fact that he is charged with a very serious charge." It denied habeas relief.

## II. Cognizability

The State argues that Chavez's federal warrant undermines the cognizability of his excessive-bail challenge. According to the State, because "a resolution of Chavez's habeas-corpus application in his favor cannot result in his immediate release, . . . his claim is not cognizable," and this appeal should be dismissed.[7]

### A. Dismissal

As an initial matter, dismissal is not the appropriate remedy for the State's cognizability complaint. Although cognizability is "a threshold issue that should be addressed before the merits of the claim may be resolved," *Ex parte Ellis*, 309 S.W.3d

---

[7]The State previously raised this argument in a motion to dismiss the appeal, but we denied the motion. It now urges the court to reconsider the issue.

71, 79 (Tex. Crim. App. 2010), it is distinct from jurisdiction.[8] *Ex parte McCullough*, 966 S.W.2d 529, 531 (Tex. Crim. App. 1998). "Certain claims may not be cognizable on habeas corpus, i.e., they may not be proper grounds for habeas corpus relief," but "if the district court denies relief, regardless of the underlying claims for the relief sought, the applicant may appeal," and "[t]he [c]ourt of [a]ppeals ha[s] jurisdiction." *Id.*; *see Ex parte Blakely*, No. 02-19-00426-CR, 2020 WL 719430, at *1 (Tex. App.—Fort Worth Feb. 13, 2020, no pet.) (mem. op., not designated for publication); *Ex parte Headrick*, 997 S.W.2d 348, 350 n.8 (Tex. App.—Fort Worth 1999, no pet.) (op. on remand). So even if we agreed with the State that Chavez's excessive-bail challenge is not cognizable, "the proper disposition of this case [would be] to affirm the trial court's order denying relief, as opposed to dismissing." *Headrick*, 997 S.W.2d at 350 n.8.

## B. Immediate Release

Regardless, we do not agree with the State that Chavez's excessive-bail challenge is not cognizable. It is true that, generally, "[a] pretrial writ application is not appropriate when resolution of the question presented, even if resolved in favor of the applicant [i.e., defendant], would not result in immediate release." *Ex parte Couch*, 629 S.W.3d 217, 217 (Tex. Crim. App. 2021); *Ex parte Weise*, 55 S.W.3d 617,

---

[8]Although the State has not expressly stated that the alleged lack of cognizability robs this court of jurisdiction, that appears to be the logic behind its dismissal argument.

619 (Tex. Crim. App. 2001). And this oft-recited rule is frequently left at that, occasionally specifying what the defendant must be released from, but rarely specifying from whom he must be released. *See, e.g., Ex parte Hammons*, 631 S.W.3d 715, 716 (Tex. Crim. App. 2021) (reciting rule without specifying from whom or what); *accord Couch*, 629 S.W.3d at 217; *Ex parte Ingram*, 533 S.W.3d 887, 892, 894 (Tex. Crim. App. 2017); *Ex parte Perry*, 483 S.W.3d 884, 895 (Tex. Crim. App. 2016) (plurality op.); *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010); *Weise*, 55 S.W.3d at 619; *Headrick v. State*, 988 S.W.2d 226, 228 (Tex. Crim. App. 1999); *see also Blakely*, 2020 WL 719430, at *3–4 (specifying from what—release "from illegal confinement or restraint"—but not from whom); *Ex parte Taylor*, No. 03-16-00689-CR, 2017 WL 4898989, at *4 (Tex. App.—Austin Oct. 26, 2017, pet. ref'd) (mem. op., not designated for publication) (similar, specifying from what—release from "the restraint on his liberty imposed by the pending criminal charges"—but not from whom); *Green v. State*, 999 S.W.2d 474, 477 (Tex. App.—Fort Worth 1999, pet. ref'd) (similar, specifying from what—release "from confinement"—but not from whom). The State appears to understand the unspoken portion of this rule to require a defendant's immediate release from government confinement generally, including confinement by other jurisdictions.[9]

---

[9]To the extent that the State limits the concept of immediate release to a defendant's discharge from physical custody, this too is erroneous. "[C]onfinement" and "restraint" encompass not only "the actual, corporeal and forcible detention of a person, but . . . [also] any coercive measures . . . whereby one person exercises a

9

But in this context, the concept of immediate release refers to a defendant's release from the illegal confinement or restraint imposed by a specific authority—not his ability to walk the streets generally.

"The writ of habeas corpus is intended to be applicable to . . . cases of confinement and restraint[] where there is no lawful right in *the person exercising the power*, or where, though the power in fact exists, it is exercised [by *that person*] in a manner or degree not sanctioned by law." Tex. Code Crim. Proc. Ann. art. 11.23 (emphasis added). The defendant's habeas petition is required to identify "by whom" he is "illegally restrained in his liberty," naming the person, "or if unknown, designating and describing them." *Id.* art. 11.14(1). So the question is whether "the person exercising the power" does so lawfully. *Id.* art. 11.23. The fact that jurisdiction A may have lawful power to confine the defendant for crime X does not

---

control over the person of another[] and [either] detains him within certain limits" or "subject[s] him to the general authority and power of the person." Tex. Code Crim. Proc. Ann. arts. 11.21, .22; *see also Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005) (recognizing that a defendant may challenge "conditions attached to bail" via a pretrial writ); *Ex Parte Martinez*, No. 02-15-00353-CR, 2015 WL 9598924, at *2 (Tex. App.—Fort Worth Dec. 31, 2015, no pet.) (mem. op., not designated for publication) ("A person who is subject to the conditions of a bond is restrained in his liberty, and that restraint must be reasonable."); *cf. Ex parte Watkins*, 73 S.W.3d 264, 274 & n.40 (Tex. Crim. App. 2002) (discussing cognizability of collateral estoppel when sudden-passion issue had already been litigated and explaining that immediate-release requirement did not apply, but noting that "in a legal sense, [appellant was] seeking 'immediate release' from a second degree punishment for attempted murder or a first degree punishment for attempted capital murder").

allow jurisdiction B to exceed the scope of its independent power in confining the person for crime Y.

And that is precisely the situation here. Chavez is subject to two different confinements by two different jurisdictions with two different legal grounds for asserting power. If Wichita County is exercising power over Chavez in an illegal manner—if it has denied him a reasonable bail for his murder charge—then he is entitled to immediate release from Wichita County's illegal confinement or restraint. *See id.* The State has not cited,[10] nor have we found, any case law to support the idea that a defendant's excessive-bail complaint loses cognizability merely because another jurisdiction asserts separate authority to confine or restrain him for a separate reason.[11]

---

[10]The cases cited by the State—*Bishai* and *Ares*—are distinguishable because (1) neither case involved an excessive-bail challenge; and (2) in those cases, the defendants were subject to detention by only one jurisdiction. *Ex parte Bishai*, Nos. 09-21-00158-CR to 09-21-00163-CR, 2021 WL 5498211, at *4–5 (Tex. App.—Beaumont Nov. 24, 2021) (mem. op., not designated for publication) (holding claim not cognizable when defendant disputed facial validity of statutes but challenged only six of ten indictments), *pet. dism'd*, Nos. PD-0935-21 to PDF-0940-21, 2022 WL 698178 (Tex. Crim. App. Mar. 9, 2022); *Ex parte Ares*, No. 13-17-00638-CR, 2019 WL 4493698, at *4 (Tex. App.—Corpus Christi–Edinburg Sept. 19, 2019, pet. ref'd) (mem. op., not designated for publication) (holding *in pari materia* claim not cognizable when defendant was charged with two counts and one did not present *in pari materia* issue on its face).

[11]To hold otherwise would effectively permit a county's illegal pretrial confinement of a defendant based on a federal jurisdiction's separate assertion of authority. The county—relying on its potentially illegitimate, independent basis for the defendant's confinement—would not be required to transfer the defendant to the federal jurisdiction, thus hindering the defendant from challenging his federal

Indeed, the Court of Criminal Appeals has acknowledged that a defendant is entitled to bail even when he is subject to confinement or restraint by another jurisdiction. *See Castaneda v. State*, 138 S.W.3d 304, 306–07 (Tex. Crim. App. 2003).[12] The bail acts "as a way [for the defendant] to exercise what little control may be available to [him] in determining the order of disposition of the pending charges":

> If the principal wishes to first dispose of charges in jurisdiction A but is in the custody of jurisdiction B, posting bond in jurisdiction B will cause the principal's transfer to jurisdiction A. If, after transfer of the principal to jurisdiction A, the surety surrenders the bond in jurisdiction B, jurisdiction B will file a detainer for the principal in jurisdiction A. Thereafter, when the charges in jurisdiction A are resolved, the principal will be returned to jurisdiction B.

*Id.*

This is not to say, of course, that Chavez is entitled to be released to the street upon posting the required bail for his murder charge. Again, the question before us is whether he is entitled to release from Wichita County's unlawful confinement or restraint. *See* Tex. Code Crim. Proc. Ann. arts. 11.21, .23. If Chavez posts the

---

detention. Yet, the county's pretrial detention would be rendered non-cognizable based on the authority of the federal jurisdiction—the very jurisdiction that the county declines to transfer the defendant to. *Cf. Weise*, 55 S.W.3d at 619–20 (reasoning that "an applicant may use pretrial writs to assert his or her constitutional protections with respect to . . . bail" in part because "these protections would be effectively undermined if these issues were not cognizable").

[12]In *Castaneda*, the Court of Criminal Appeals was addressing a different issue: whether a bail bondsman is liable when its principals are transferred to federal authorities and subsequently fail to appear in state court. 138 S.W.3d at 306–11. Nonetheless, the court's opinion is instructive regarding bail's operation when a defendant is subject to confinement by multiple jurisdictions.

required bail, "[t]he sheriff [must do] as the law requires and . . . release[] the principal from the custody of [that] County and set him at liberty as to [that] County." *Castaneda*, 138 S.W.3d at 310. But "[t]hat is all the sheriff can legally do[—]he has no authority to accept a surety bond on a detainer filed by another jurisdiction," and he is not required to "release the principal to the street" if another jurisdiction has an outstanding warrant that requires the defendant's transfer. *Id.*

Here, then, Chavez's excessive-bail challenge could in fact result in his immediate release from the confinement or restraint of the person unlawfully exercising its power: Wichita County. *See* Tex. Code Crim. Proc. Ann. art. 11.23; *see also Castaneda*, 138 S.W.3d at 306–07, 309–10. Whether he will be freed from other jurisdictions' restraints and immediately released "to the street" is not the test. *Cf. In re Wiles*, No. 08-18-00177-CR, 2019 WL 1810756, at *3 (Tex. App.—El Paso Apr. 24, 2019, orig. proceeding) (not designated for publication) (holding trial court erred by issuing bail order that directed sheriff to ignore ICE detainer and noting that, while the sheriff "was required, upon receipt of the personal bond, to release [the defendant] from the custody of El Paso County and set him at liberty as to El Paso County, he could not release him to the street because it would violate the duty [to honor ICE detainers] imposed on him by Article 2.251"). Chavez's excessive-bail challenge is cognizable in this habeas proceeding.

13

## II. Excessive Bail

Turning to the merits of his habeas petition, we address Chavez's contention that his $1 million bail is excessive.

## A. Governing Law and Standard of Review

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 2105 (1987); *Ex parte Hanson*, No. 02-22-00045-CR, 2022 WL 1496533, at *1 (Tex. App.—Fort Worth May 12, 2022, no pet.) (mem. op., not designated for publication) (quoting *Salerno*). Our federal and state constitutions reflect this norm by, among other things, prohibiting the imposition of "[e]xcessive bail." U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Const. art. I, § 11.

Bail is excessive if it is "in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Hanson*, 2022 WL 1496533, at *1 (quoting *Ex Parte Peyton*, No. 02-16-00029-CR, 2016 WL 2586698, at *3 (Tex. App.—Fort Worth May 5, 2016) (mem. op., not designated for publication), *pet. dism'd*, No. PD-0677-16, 2017 WL 1089960 (Tex. Crim. App. Mar. 22, 2017) (not designated for publication)). The government's primary interest, and bail's primary purpose, is to provide a reasonable assurance of the defendant's presence at trial. *Id.*; *see* Tex. Code Crim. Proc. Ann. art. 17.01; *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977).

In setting bail, a trial court is "governed by the Constitution and the following" statutory guidelines:

1. Bail and any conditions of bail shall be sufficient to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be used to make bail an instrument of oppression.

3. The nature of the offense and the circumstances under which the offense was committed are to be considered, including whether the offense: (A) is an offense involving violence as defined by Article 17.03; or (B) involves violence directed against a peace officer.

4. The ability to make bail shall be considered, and proof may be taken on this point.

5. The future safety of a victim of the alleged offense, law enforcement, and the community shall be considered.

6. The criminal history record information for the defendant . . . shall be considered, including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release on bail.

7. The citizenship status of the defendant shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15(a) (indentation altered). The Court of Criminal Appeals has identified other factors to be considered as well, including the defendant's work record, his family ties, and his length of residency. *See Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. [Panel Op.] 1981) (listing many factors reflected in the current version of Article 17.15).

We review a trial court's bail determination for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's decision. *Ex parte Gomez*,

15

624 S.W.3d 573, 576 (Tex. Crim. App. 2021). We will not disturb the decision if it is within the zone of reasonable disagreement. *Hanson*, 2022 WL 1496533, at *2. The defendant has the burden to show that it is not within that zone. *Id.*; *see Gomez*, 624 S.W.3d at 576.

## B. Analysis

Chavez carried his burden here. Although many of the bail considerations weigh against him, the record before us does not support a determination that a $1 million bail is necessary to satisfy the government's legitimate interests.

### 1. Nature of the Offense and Potential Sentence

The nature of the defendant's alleged offense and the length of his potential sentence are the "primary factors" we consider in evaluating a bail decision. *Hanson*, 2022 WL 1496533, at *2 (quoting *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pets. ref'd)); *see* Tex. Code Crim. Proc. Ann. art. 17.15(a)(3); *Rubac*, 611 S.W.2d at 849. Here, these factors weigh in favor of a reasonably high bail.

Chavez is charged with a violent, public murder—a first-degree felony. *See* Tex. Penal Code Ann. § 19.02(b), (c). Although the State represents that he is charged with third-degree-felony deadly conduct as well—for shooting at the Gonzalezes' home on the day of the murder—nothing in the record indicates that Chavez has been indicted for that offense.[13] *See id.* § 22.05(b), (e). Even so, the facts underlying

---

[13]The record reflects that Chavez was arrested for deadly conduct, but it does not show that he was indicted for that offense.

the purported deadly conduct charge are part of the circumstances of Chavez's murder charge, and with or without a separate indictment for deadly conduct, those factual allegations are weighty.

Chavez himself acknowledges that he faces "a serious charge." If convicted of murder, his punishment will range from five years to 99 years or life in prison. *See id.* § 12.32(a). And the prospect of a potentially lifelong sentence heightens "the importance of setting bail sufficiently high to secure [Chavez's] appearance at trial." *Ex parte Rotter*, No. 02-21-00016-CR, 2021 WL 2006313, at *3 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op., not designated for publication) (affirming $750,000 bail for murder); *see Ex parte Scott*, 122 S.W.3d 866, 869 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that "the accused's reaction to the prospect of a lengthy sentence might be to not appear").

These factors weigh in favor of a reasonably high bail amount. *See Hanson*, 2022 WL 1496533, at *3–4 (concluding similarly in review of $1 million murder bail).

### 2. Safety Risk

The "future safety of a victim of the alleged offense, law enforcement, and the community shall [also] be considered" in the bail analysis. Tex. Code Crim. Proc. Ann. art. 17.15(a)(5).

The allegation that Chavez committed a violent murder certainly raises a generalized concern for the community's safety. *See Hanson*, 2022 WL 1496533, at *4 (acknowledging that defendant's commission of alleged murder raised generalized

17

safety concern). But the State offered very little evidence that Chavez presents an identifiable threat to specific Wichita County residents or that the threat is ongoing. *Cf. id.* (noting lack of evidence that defendant posed identifiable threat to specific community members). There was no testimony offered on this subject at the habeas hearing.

On appeal, the State points out that one of the probable-cause affidavits described Chavez as having fought with, shot at, and threatened the three "Gonzalez brothers"—not just the victim, Jorge Gonzalez. Yet, these affidavit references were not mentioned, much less elaborated upon, in the trial court hearing. *Cf. Ex parte Cook*, No. 02-18-00537-CR, 2019 WL 2323643, at *4 (Tex. App.—Fort Worth May 31, 2019, no pet.) (per curiam) (mem. op., not designated for publication) (holding $750,000 bail excessive in murder case and noting that, "[o]ther than the circumstances of the charged murder and burglary offenses, the hearing did not develop additional evidence . . . that [the defendant] was a danger to the community"). And while the failure to highlight these affidavit references does not preclude consideration of them on appeal, there was no evidence of the whereabouts of the victim's two brothers nor any evidence that bail conditions would be insufficient to protect those brothers. In fact, there was no discussion of any safety-related bail conditions at all.

Although the release of an accused murderer creates a generalized safety concern, on this record we hold that the scant evidence that Chavez poses an

identifiable threat is insufficiently related to Chavez's $1 million bail. *See Hanson*, 2022 WL 1496533, at *4–5 (concluding similarly when evidence did not show that murder defendant with $1 million bail posed an identifiable threat); *Ex parte Taylor*, No. 02-20-00010-CR, 2020 WL 1963788, at *7–8 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (noting that aggravated robbery offense raised safety concerns but that bail conditions protected the community and holding $500,000 bail excessive).

### 3. Criminal History

A court setting bail must also consider "[t]he criminal history record information for the defendant." Tex. Code Crim. Proc. Ann. art. 17.15(a)(6). A defendant's criminal history can suggest that the defendant would be a danger to the public if released on bail. *Hanson*, 2022 WL 1496533, at *4; *cf. Peyton*, 2016 WL 2586698, at *5 (considering criminal history as part of safety analysis).

Chavez's criminal history shows just one prior conviction: a misdemeanor assault family violence offense. The habeas record contains little evidence related to the details or circumstances of this offense—the record shows only that it occurred in 2016 and that he pleaded guilty to the offense. Chavez's mother testified that the offense involved the mother of Chavez's seven-year-old son. She commented that Chavez "didn't put a hand on her or anything" but that "she just called the police on

19

him."[14] Apart from this commentary and the entry on Chavez's criminal record, there is no other evidence regarding what occurred. *Cf.* Tex. Code Crim. Proc. Ann. art. 17.15(a)(6) (requiring consideration of a defendant's criminal history "including any acts of family violence").

This was Chavez's only prior conviction;[15] he had no prior felony convictions. *See Hanson*, 2022 WL 1496533, at \*4 (weighing criminal history in favor of a lower bail amount when defendant charged with murder had a prior DWI conviction, a DWI arrest, and an arrest for theft of property); *Peyton*, 2016 WL 2586698, at \*5–6 (holding $1 million bail excessive where defendant was charged with solicitation to commit capital murder but had no prior felony convictions).

Of course, Chavez still has a pending federal charge for intrastate transport of illegal aliens. *See* Tex. Code Crim. Proc. Ann. art. 17.15(a)(6) (requiring consideration of "other pending criminal charges"); *see also* 8 U.S.C.A. § 1324(a)(1)(A)(ii) (providing criminal punishment for a person who, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves . . . such alien within the United States . . . in furtherance of such violation of law"). According to the probable-cause affidavit that accompanied this

---

[14]Earlier in the hearing, Chavez's mother had testified that Chavez did not see his seven-year-old son because he and the son's mother "had issues."

[15]Chavez also had a prior arrest for misdemeanor marijuana possession in 2019. The State does not contend that this arrest presents an ongoing safety threat to the community.

charge, Chavez told Border Patrol agents that he had been working on a job in San Antonio and had joined a co-worker on a visit to the co-worker's family in Uvalde. A group of illegal aliens approached him outside his Uvalde motel and offered to pay for his gas in exchange for a ride to San Antonio. He claimed that he "was just trying to be a good guy and give them a ride and they were all headed in the same direction anyway," so he allowed the men to ride in the backseat and bed of the pickup truck he was driving. There is no evidence that Chavez helped the illegal aliens cross the border into the United States, nor is there any evidence that his actions involved violence.

While Chavez's criminal history does not paint him in a favorable light, it does not indicate that he poses such a significant ongoing safety threat as to require a $1 million bail. *See Hanson*, 2022 WL 1496533, at *4 (holding criminal history did not reflect danger to public when defendant had one prior conviction for DWI and two prior arrests for DWI and theft); *Ex parte Piceno*, No. 02-13-00421-CR, 2014 WL 2611191, at *1, *5–6 (Tex. App.—Fort Worth June 12, 2014, no pet.) (mem. op., not designated for publication) (holding $500,000 bail excessive for sexual assault of a child despite "significant criminal history" including juvenile adjudications for terroristic threat and two burglaries of a habitation).

### 4. Bail Compliance

Chavez's past behavior while on bail does raise a concern. The trial court was required to consider "any instances in which the defendant failed to appear in court

21

following release on bail," Tex. Code Crim. Proc. Ann. art. 17.15(a)(6), and the State argues that Chavez has failed to appear on two prior occasions.

The first of the two occasions occurred during Chavez's assault family violence case. The court data associated with that case indicates that Chavez "absconded" a few months before he pleaded guilty, but details were not provided. The evidence regarding this incident was confined to a single line buried in Chavez's criminal history report, stating "PROVISION[:] ABSCONDED." No other useful information about the incident was elicited at the hearing.

The second of the two bail-compliance incidents relates to Chavez's pending federal-court charge. Chavez's mother testified that "[h]e told [her] he was calling, reporting in" on his federal charge. The State refuted this by offering a police dispatch log as evidence that, on the day Chavez was arrested for murder, the United States Marshals Service informed the Wichita Falls Police Department that it had an active "no bail warrant" for Chavez's arrest due to his failure to report. [Capitalization altered.] But again, there was no other relevant information provided regarding this bail violation.

The State contends, though, that these bail-compliance incidents reflect "a demonstrated incapability of following rules and norms" that has continued throughout Chavez's time in jail. It points to the three jailhouse infractions that Chavez has been disciplined for—using another inmate's tablet access, breaking his identification card, and throwing a chess piece in a detention officer's direction—and

22

warns that these demonstrate "his inability to abide by bail conditions." But once again, the record provides relatively little detail regarding these incidents. The jail reports documenting Chavez's infractions summarize his objectionable conduct in no more than three sentences each. And while we do not condone the violation of jail rules, it is a stretch to equate using another inmate's tablet access, breaking an identification card, or throwing a chess piece with a complete inability to comply with court-imposed bail conditions on which one's money and freedom are contingent. *Cf. Ex parte Sanderson*, No. 02-21-00053-CR, 2021 WL 2843830, at *2, *4 (Tex. App.—Fort Worth July 8, 2021, no pet.) (mem. op., not designated for publication) (noting that misbehavior weighed against lowering bail when jail incidents "included twice exposing his genitals to prison staff, once inciting a riot, and cursing and threatening to kill a staff member").

Nonetheless, as with the last two factors—Chavez's safety risk and criminal history—his prior failures to appear and jailhouse infractions do not weigh in his favor. *See Ex parte Sells*, No. 02-20-00143-CR, 2020 WL 7639574, at *4 (Tex. App.—Fort Worth Dec. 23, 2020, no pet.) (mem. op., not designated for publication) (noting that defendant's prior convictions for failing to appear "are no doubt concerning when considering that the intent of bail is to secure his appearance at trial"). The question remains, however, given the limited evidence regarding these compliance issues, whether the evidence supports the setting of bail in the amount of $1 million.

23

### 5. Community Ties

Chavez's family ties weigh in his favor and indicate that he is likely to stay in Wichita County. *See Taylor*, 2020 WL 1963788, at *6 ("The point of looking at a defendant's community and family ties is to assay the likelihood that he will appear for trial."); *Peyton*, 2016 WL 2586698, at *5 (noting that defendant's community ties gave him an incentive to stay despite pending charges); *see also Rubac*, 611 S.W.2d at 849 (listing family ties as bail consideration). Chavez's children live there, his girlfriend (and the mother of one of his children) lives there, his mother lives there, and his five sisters live there. Chavez's mother testified that he had worked for a roofing company "since he was like 15[ or] 16," and she predicted that he could resume work upon his release. *See Rubac*, 611 S.W.2d at 849 (listing work record as bail consideration). And the State's own records reflect that Chavez is a United States citizen who was born in Texas. *See* Tex. Code Crim. Proc. Ann. art. 17.15(a)(7) (stating that "[t]he citizenship status of the defendant shall be considered" in bail determination).

Nonetheless, the State argues that Chavez has "significant out-of-town ties." It notes that his father's family lives in Mexico, that in the past he has traveled for work, and that he is accused of smuggling illegal aliens. But the record is devoid of evidence supporting the State's contention that these facts constitute "significant out-of-town ties." *See Cook*, 2019 WL 2323643, at *4 (holding that community ties weighed in favor of reduced bail because "[d]espite the State's argument . . . that [the murder

24

defendant] had significant community ties outside of Wichita County, the evidence d[id] not support that position").

Chavez's mother testified that he "doesn't really see" his family in Mexico and that "[h]e was little the last time [h]e went [there]." While the trial court was not required to believe her testimony, *see Ex parte Parker*, No. 02-23-00029-CR, 2023 WL 2926556, at *4 (Tex. App.—Fort Worth Apr. 13, 2023, no pet.) (mem. op., not designated for publication); *Ex parte Kienlen*, No. 02-22-00154-CR, 2022 WL 15053326, at *9 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op., not designated for publication), there was no evidence to contradict her either.

As for his traveling out of town, the record contains no evidence that through Chavez's out-of-town work trips he forged "significant" connections elsewhere. *Cf. Cook*, 2019 WL 2323643, at *4 (concluding that murder defendant's "[f]ive months of work in another locale in Texas [were] insufficient to raise serious concerns that [he] w[ould] abscond as argued [by the State] on appeal"). And Chavez's mother testified that, if he were required to stay in Wichita County, he would not take any out-of-town roofing jobs.

Regarding the federal charge, Chavez is accused of intrastate transport of illegal aliens. There is no evidence that this incident supplied Chavez with foreign smuggling connections that could assist him in fleeing.

Thus, Chavez's deep family ties to Wichita County weigh in favor of a lower bail amount.

**6.    Ability to Make Bail**

This brings us to the final relevant consideration: "[t]he [defendant's] ability to make bail." Tex. Code Crim. Proc. Ann. art. 17.15(a)(4). Although this factor is not dispositive, it is important. Bail must not be so high as to be "an instrument of oppression." *Id.* art. 17.15(a)(2). It is considered oppressive if it is set in an amount higher than the defendant can afford for the purpose of forcing him to remain incarcerated. *Hanson*, 2022 WL 1496533, at *6.

To prove that a bail amount is beyond what the defendant can afford, the defendant must establish that "his and his family's funds have been exhausted," *Ex parte Robles*, 612 S.W.3d 142, 148 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *see Ex parte Ramirez-Hernandez*, 642 S.W.3d 907, 920 (Tex. App.—San Antonio 2022, no pet.), that he has made an attempt to furnish bail in the set amount, *see Ex parte Dueitt*, 529 S.W.2d 531, 532 (Tex. Crim. App. 1975); *Ex parte Williams*, 467 S.W.2d 433, 434 (Tex. Crim. App. 1971), or that there is an "enormous gap between what bail [the defendant can] . . . afford[] and what bail the trial court actually set," *Hanson*, 2022 WL 1496533, at *6–7 (quoting *Ex parte Estrada*, 640 S.W.3d 246, 255 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd)). Chavez did this.

Chavez offered evidence that there is an "enormous gap between what bail . . . [he could] afford[] and what bail the trial court actually set." *Id.* at *7 (quoting *Estrada*, 640 S.W.3d at 255). His mother testified that posting the $1 million bail requires paying $100,000 to the bondsman, and that even if she, his sisters, and his

girlfriend pool their resources, the most they can afford is $8,000. The evidence shows that Chavez has no vehicle he can sell or house he can mortgage to gather additional funds. *Cf. Peyton*, 2016 WL 2586698, at *4 (noting defendant's inability to satisfy $1 million bail when, among other things, he did not own a house or operational vehicle). And the current bail amount is more than ten times the bail amount that the evidence indicates Chavez and his family can afford. *Cf. Ludwig v. State*, 812 S.W.2d 323, 324–25 (Tex. Crim. App. 1991) (holding $1 million aggregate bail excessive for two alleged murders and one alleged capital murder when evidence showed that defendant's family could "scrape together, at best, $10,000" and bail set by court required "ten times th[at] amount"); *Cook*, 2019 WL 2323643, at *4 (holding $750,000 bail excessive in murder case and noting that the defendant's "family was having difficulty putting together the funds to secure [his] release when his bail was set at $100,000 and had no hope after the amount was raised to $ 750,000"). This is an enormous gap, and it weighs in favor of a lower bail amount.[16]

---

[16]The State analogizes this case to *Parker*, in which we affirmed two $1.5 million bails. *See Parker*, 2023 WL 2926556, at *1–4. But there, the defendant was "accused of stealing potentially millions of dollars" and using the money to purchase items of personal property. *Id.* at *3–4. The money was unaccounted for, the defendant's business entities had ambiguous finances and assets, and the entities owned valuable equipment. *Id.* at *1–2, *4. Plus, Parker's wife stated that the couple received between $10,000 and $15,000 per month in royalties. *Id.* at *2–4. Based on this evidence, we held that the trial court had a reasonable basis "to believe that [the defendant] may have been capable of paying the [two $1.5 million] bail amounts." *Id.* at *4. Here, there is no evidence that Chavez has any obscure business assets, that he receives any royalty income, that he owns any real property, or that he has stolen large

27

## C.  Summary

Generally, absent exceptional circumstances, a $1 million bail for a single, non-capital offense is worrisome.  *See Kienlen*, 2022 WL 15053326, at *10 (noting that a cumulative bail of $1.435 million would be worrisome but that defendant failed to prove it excessive); *Hanson*, 2022 WL 1496533, at *1–7 (reversing $1 million bail for murder).  This is particularly true when, as here, the defendant has offered evidence of an "enormous gap" between the $1 million bail and the amount he can afford to pay. *Hanson*, 2022 WL 1496533, at *7; *see Ludwig*, 812 S.W.2d at 324–25.

Although Chavez is accused of a violent offense with a potentially lifelong sentence, although he has some criminal history, and although he has apparently failed to appear on two prior occasions, he has deep family ties to Wichita County, and there is scant evidence that he presents an ongoing or identifiable safety threat.  His mother testified that he would comply with—and that she and Chavez's girlfriend would make sure he complied with—any bail conditions imposed upon him, and such conditions could help mitigate the flight risk and generalized safety concerns shown by the limited evidence at the habeas hearing.

While the record supports a reasonably high bail amount, the key word is "reasonably."  *Cf.* U.S. Const. amend. VIII; Tex. Const. art. I, § 13.  And on this record, there is insufficient evidence that a $1 million bail is reasonably necessary to

---

sums of money.  Rather, the undisputed evidence shows that the $1 million bail is far beyond what he or his family can afford.

protect the State's legitimate interests and to secure Chavez's presence at trial. *See Peyton*, 2016 WL 2586698, at *6 (reversing $1 million bail for solicitation of capital murder because, "[a]lthough the nature of the offense and the circumstances surrounding it [we]re severe," $1 million was "an amount greater than necessary to ensure [the defendant's] appearance").

### III. Conclusion

Because Chavez has a right to be free from excessive bail, because his assertion of this right is cognizable despite the federal warrant for his arrest, and because, on this record, the amount of his current $1 million bail is excessive, we reverse the trial court's order denying habeas relief. We remand the case to the trial court to set a reasonable bail and to determine what bail conditions should be imposed.[17]

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Publish

Delivered: June 15, 2023

---

[17]On remand, the trial court may allow the parties an opportunity to present additional evidence or argument.